**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 0 7 2024

TAMMY H. DOWNS, CLERK
By:_____
_____ DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS
# DELTA DIVISION

| | |
|---|---|
| RYAN PAGE, individually and on behalf of all others similarly situated, | |
| | Case No.: **2:24-cv-143-BSM** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| | **JURY TRIAL DEMANDED** |
| EVOLVE BANK AND TRUST, | This case assigned to District Judge **Miller** |
| Defendant. | and to Magistrate Judge **Kearney** |

Ryan Page ("Plaintiff"), brings this Class Action Complaint on behalf of himself and all others similarly situated ("Class Members" or "proposed Class Members"), against Defendant, Evolve Bank and Trust ("Defendant" or "Evolve"). In support, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1. This class action lawsuit arises out of Evolve's failure to implement reasonable and industry standard data security practices to properly secure, safeguard, and adequately destroy Plaintiff's and the proposed Class Members' sensitive personally identifiable information ("PII") that it had acquired and stored as part of its business relationship with various financial technology companies.

2. Defendant's data security failures allowed a targeted cyberattack on or about June 18, 2024, in which cyber criminals compromise Defendant's information systems ("Data Breach") which contained Plaintiff's and other individuals PII[1].

3. Evolve is a national financial services institution recognized as a global leader in

---

[1] https://www.getevolved.com/about/news/cybersecurity-incident/ (last visited June 29, 2024).

the payments and banking-as-a-service ("BaaS") industry. Defendant offers various products to its customers, including loans, checking accounts, savings accounts, and much more.

4.      The PII compromised in the Data Breach included certain personal information of individuals whose PII was maintained by Defendant, including Plaintiff.

5.      Upon information and belief, a wide variety of PII was implicated in the breach, including full names, Social Security numbers, dates of birth, account information and other personal information.

6.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' PII with which it was hired and expected to protect.

7.      The mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure PII from those risks left that property in a dangerous condition.

8.      Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' PII; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and full notice of the Data Breach.

9.      In addition, Defendant failed to properly maintain and monitor the computer

2

network and systems that housed the PII. Had it properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals a period of unimpeded access to the Plaintiff's and Class Members' PII.

10. Moreover, if Evolve had implemented reasonable logging, monitoring, and alerting systems, it would have known about the malicious activity soon enough to enable it to stop the attack before the cybercriminals had time to identify digital assets, stage them for exfiltration, and then exfiltrated those assets without being caught.

11. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the PII that Defendant collected and maintained is now in the hands of data thieves.

12. Because of the Data Breach, Plaintiff and Class Members are now at a current, imminent, and ongoing risk of fraud and identity theft. Plaintiff and Class Members must now and for years into the future closely monitor their medical and financial accounts to guard against identity theft. As a result of Defendant's unreasonable and inadequate data security practices, Plaintiff and Class Members have suffered numerous actual and concrete injuries and damages.

13. The risk of identity theft is not speculative or hypothetical but is impending and has materialized as there is evidence that the Plaintiff's and Class Members' PII was targeted, accessed, has been misused, and disseminated on the Dark Web—and because the data stolen includes all the necessary ingredients to allow cybercriminals to perpetrate financial and identity fraud even without having to use fullz packages or otherwise buy additional information.

14. Plaintiff and Class Members must now closely monitor their financial accounts to guard against future identity theft and fraud. Plaintiff and Class Members have heeded such

warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will continue to include in the future, among other things: (a) reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against the imminent risk of identity theft.

15.     Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (g) deprivation of value of their PII; and (h) the continued risk to their sensitive PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it collected and maintained.

16.     Through this complaint, Plaintiff pursues legal redress for these harms on behalf of himself and all similarly situated individuals whose PII was accessed during the Data Breach.

17.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

## **PARTIES**

18.     Plaintiff Ryan Page is an adult individual and is a citizen of Massillon, Ohio, where she intends to remain.

19.     Plaintiff received an email from Evolve on July 31, 2024, informing him that the information she shared with Evolve had been compromised as part of the Evolve Bank & Trust Data Breach.

20.     The email from Evolve further informed Plaintiff that his name, contact information, Evolve Account Number, Social Security Number, and Date of Birth were likely compromised in the Evolve Data Breach.

21.     Because Plaintiff's sensitive PII is now in the hands of cybercriminals, he has suffered significant stress and anxiety over his future financial health and the uncertainty of how he can protect himself from such further harm.

22.     Plaintiff has spent significant time responding to Evolve's Data Breach, including by reviewing his credit and account statements for fraudulent activity.

23.     Plaintiff values his privacy and make every reasonable effort to keep their personal information private, but they lost control over that privacy when Evolve allowed cybercriminals unfettered access to their data.

24.     Plaintiff has been injured in a number of ways, including by the damage to and diminution in value of their PII—a form of intangible property that Plaintiff entrusted to Evolve. This information has inherent value that Plaintiff was deprived of when their PII was placed on a publicly accessible database, exfiltrated by cybercriminals.

25.     The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

26.     In addition to the increased risk and the actual harm suffered, the Data Breach has

caused Plaintiff to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach, and self-monitoring accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured.

27.     The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety.

28.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

29.     Defendant is an Arkansas chartered bank and trust with a principal place of business at 301 Shoppingway Boulevard, West Memphis, Arkansas 72301. Defendant provides retail and commercial banking services in several states. Evolve is also a major credit card issuer, is active in the fintech business sector, and is a top 50 originator and receiver of ACH payments in 2023 according to NACHA.[2]

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members exceeds 100, some of whom have different citizenship from Defendants, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

---

[2] *See* https://www .nacha.org/news/nacha-unveils-top-50-ach-originating-and-receiving-financial-institutions-2023 (last visited August 2, 2024).

31.     Defendant is a citizen of Arkansas because it is a bank and trust formed under Arkansas law with its principal place of business in West Memphis, Arkansas.

32.     The District of Arkansas has personal jurisdiction over Defendant because it conducts substantial business in Arkansas and this District and collected and/or stored the PII of Plaintiff and Class Members in this District.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendants is domiciled in this District, maintains Plaintiff's and Class Members' PII in this District, and has caused harm to Plaintiff and Class Members in this District.

## FACTUAL BACKGROUND

34.     Plaintiff and Class Members are customers of the Defendant who use Defendant's banking services.

35.     When opening an account with Defendant, Plaintiff and Class Members were required to provide their sensitive and personal information, including financial information, contact information, and Social Security Numbers.

36.     Indeed, the notification emails that Plaintiff has received confirmed that Defendant collected and stored their financial information and Social Security numbers, among other valuable PII.

37.     Notwithstanding its duty to implement reasonable cybersecurity, Defendant failed to implement sufficient logging, monitoring, and alerting systems that would have allowed it to detect that it was being attacked in a timely manner so that it could prevent the exfiltration of Plaintiff's and the proposed Class Members' information.

38.     Yet, Defendant did not know it was being attacked until May 29, 2024, when it noticed that some of its systems were no longer functioning as expected.

39.     At first, Defendant believed the failures to be related to hardware issues, rather than a cybersecurity attack.

40.     On information and belief, and because it is the modus operandi of cybercriminals, the hackers had already performed reconnaissance activities, staged data, and exfiltrated the stolen data before Defendant even knew that the IT outages were due to a cyberattack. The failure to understand what was happening is clear evidence of Evolve's failure to implement reasonable tools to monitor the events happening in its information systems.

41.     At all relevant times, Defendant knew it was storing Plaintiff's and Class Members' PII, and that, as a result, Defendant's systems would be attractive targets for cybercriminals.

42.     Defendant also knew that any breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised, especially given that Data Breaches have become unfortunately ubiquitous.

43.     PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data because of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[3]

---

[3] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited June 29, 2024).

44.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. According to the ITRC, in 2019, there were 1,473 reported data breaches in the United States, exposing 164 million sensitive records and 705 million "non-sensitive" records.[4]

45.     In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years. For instance, in 2018, 14.4 million people were victims of some form of identity fraud, and 3.3 million people suffered unrecouped losses from identity theft, nearly three times as many as in 2016. And these out-of-pocket losses more than doubled from 2016 to $1.7 billion in 2018.[5]

46.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's customers especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

47.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that

---

[4] *Data Breach Reports: 2019 End of Year Report*, IDENTITY THEFT RESOURCE CENTER, at 2, *available at* https://notified.idtheftcenter.org/s/resource#annualReportSection.

[5] Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20(1).

attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[6]

48.     Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

49.     Defendant agreed to and undertook legal duties to maintain the protected personal information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Under state and federal law, businesses like Defendant's have a duty to protect their clients' current and former customers' PII and to notify them about breaches.

50.     The PII held by Defendant in its computer system and network included the highly sensitive PII of Plaintiff and Class Members.

51.     The Data Breach occurred as a direct result of Defendants' failure to implement and follow basic security procedures, and its failure to follow its own policies, to protect Plaintiff's and Class Members' PII.

---

[6] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.

52.     For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff's and Class Members' significant injuries and harm in several ways. Plaintiff and Class Members must immediately devote time, energy, and money to: 1) closely monitor their bank statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

53.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, because of Defendants' conduct. Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach.

54.     As a result of Defendant's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of PII.

55.     From a recent study, 28% of consumers affected by a data breach become victims of identity fraud – this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[7]

---

[7] https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.

56.     In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[8]

57.     Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fails to undertake the necessary and appropriate security and training measures to protect Plaintiff's and Class Members' PII.

58.     Because of Defendant's ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

59.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

60.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

61.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information

_____

[8] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/.

through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

62.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[9] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[10] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

63.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the PII at issue here.[11] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[12] As Microsoft warns "[t]he anonymity of the dark web lends itself

---

[9] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[10] *Id.*

[11] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[12] *Id.*; *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

well to those who would seek to do financial harm to others."[13]

64.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[14]

65.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

66.     Even then, new Social Security number may not be effective, as the "credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[15]

---

[13] *Supra* note 10.

[14] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[15] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

67.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[16]

68.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[17]

69.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[18] Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.

70.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

71.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, victims of new account identity theft will likely have to spend

---

[16] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[17] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.
[18] *Id.*

time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

72.     The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[19]

73.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[20]

74.     Defendant's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability

---

[19] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable),
http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

[20] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

75.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm, but the resource and asset of time has been lost.

76.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

77.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[21]

---

[21]     "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.



78.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

---

[22] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[23] *See* https://www.identitytheft.gov/Steps.

79.     PII is a valuable property right.[24] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

80.     PII can sell for as much as $363 per record according to the Infosec Institute.[25]

81.     An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[26] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[27, 28] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[29]

82.     As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

---

[24] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[25] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[26] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[27] https://datacoup.com/.

[28] https://digi.me/what-is-digime/.

[29] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

83.     To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, despite Plaintiff and Class Members being at risk of identity theft and fraud for the foreseeable future. Defendant has not offered any relief or protection. Furthermore, this is a tacit admission that its failure to protect their PII has caused Plaintiff and Class Members substantial injuries.[30]

84.     Defendant also places the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.[31]

85.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes (e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims).

86.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

87.     Furthermore, the information accessed and disseminated in the Data Breach is

---

[30] *See* https://www.businesswire.com/news/home/20240206060527/en/MMRG-Notifies-Patients-of-Cybersecurity-Incident (last visited June 29, 2024).
[31] *Id.*

significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[32] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

88.     Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

89.     The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

90.     Moreover, Plaintiff and Class Members have an interest in ensuring that PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online and that access to such data is password protected.

91.     Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses and lost time. Also, they have suffered or are at an increased risk of suffering:

---

[32] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

a.      loss of the opportunity to control how their PII is used;

b.      diminution in value of their PII;

c.      compromise and continuing publication of their PII;

d.      out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e.      lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.      delay in receipt of tax refund monies;

g.      unauthorized use of their stolen PII;

h.      Significant emotional and mental anguish, stress, and anxiety caused by the uncertainty of the financial future because of Defendant's negligence, which resulted in their highly sensitive PII falling into the hands of cybercriminals adept at exploiting such information for their nefarious financial fraud and identity theft objectives; and

i.      continued risk to their PII—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

92.     Plaintiff and Class Members have been damaged by the compromise and exfiltration of their PII in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

93.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and

identity theft.

94.     Further, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

95.     Specifically, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

      a.     Finding fraudulent charges;

      b.     Canceling and reissuing credit and debit cards;

      c.     Purchasing credit monitoring and identity theft prevention;

      d.     Addressing their inability to withdraw funds linked to compromised accounts;

      e.     Visiting to banks to obtain funds held in limited accounts;

      f.     Placing "freezes" and "alerts" with credit reporting agencies;

      g.     Spending significant time and effort disputing fraudulent charges;

      h.     Contacting financial institutions and closing or modifying financial accounts;

      i.     Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.      Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.      Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

96.     In addition, Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the property of loss of value damages in related cases.

97.     Plaintiff and Class Members are forced to live with the anxiety that their PII—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

98.     Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII. Early notification helps a victim of a Data Breach mitigate their injuries, and conversely, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach and has not formally notified all victims. They have yet to offer an explanation of the purpose for the delay.

## CLASS ALLEGATIONS

99.     Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following Class:

All individuals in the U.S. whose PII was compromised in the Data Breach.

100.     Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

101.     Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

102.     **Numerosity.** The Class described above are so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the files implicated in the Data Breach. Though the exact size of the Class remains unknown, but it is believed to be in the millions.

103.     **Commonality.** This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a.     Whether Defendant had a duty to protect the PII of Plaintiff and Class Members;

b.     Whether Defendant had a duty to maintain the confidentiality of Plaintiff and Class Members' PII;

c.     Whether Defendant was negligent in collecting, storing and safeguarding Plaintiff's and Class Members' PII, and breached its duties thereby;

25

        d.      Whether Defendant breached its fiduciary duty to Plaintiff and the Class.

        e.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct;

        f.      Whether Plaintiff and Class Members are entitled to restitution or disgorgement because of Defendant's wrongful conduct; and

        g.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced because of the Data Breach.

104.    **Typicality**. Plaintiff's claims are typical of the claims of the Class Members. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same failure by Defendant to safeguard PII. Plaintiff and Class Members information was stored by Defendant's software, each having their PII obtained by an unauthorized third party.

105.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members they seek to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

106.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its

common law and statutory duties to secure PII on its network server, then Plaintiff and each Class Member suffered damages from the exposure of sensitive PII in the Data Breach.

107.   **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

108.   **Manageability.** The precise size of the Class is unknown without the disclosure of Defendant's records. The claims of Plaintiff and the Class Members are substantially identical as explained above. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiff and the Class.

<u>**FIRST CAUSE OF ACTION**</u>
**NEGLIGENCE AND NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

109.   Plaintiff hereby repeats and realleges the foregoing allegations.

110.   Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

111.   Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

112.   Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing PII that is

routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

113.    Defendant's duty also arose from Defendant's position as a financial institution and e-commerce cite. Defendant holds itself out as a trusted data collector, and thereby assumes a duty to reasonably protect its customers' employees' information. Indeed, Defendant, as a direct data collector, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members because of the Data Breach.

114.    Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to follow its own privacy policies and practices published to its clients.

115.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

116.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including—as interpreted and enforced by the FTC—the unfair act or practice by entities such as

Defendant or failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

117.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect the PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach involving the PII of its customers.

118.    Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

119.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

120.    The harm that has occurred because of Defendant's conduct is the type of harm that the FTC Act was intended to guard against.

121.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

        a.    Privacy violations due to the disclosure of their private information;

        b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts, including the costs of credit monitoring;

        c.    Lowered credit scores from credit inquiries following fraudulent activities;

        d.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendants Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection

services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

e. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals because of the disclosure of Plaintiff's and the proposed Class Members' financial information and Social Security numbers being divulged to cybercriminals;

f. Damages to, and diminution in value of, their PII entrusted to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

g. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

h. The erosion of the essential and confidential relationship between Defendant—as a banking provider—and Plaintiff and Class Members as its clients' customers; and

i. Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received.

122. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

123.    Plaintiff incorporates all previous paragraphs as if fully set forth below.

124.    Plaintiff brings this claim individually and on behalf of the Class.

125.    Plaintiff and Class Members have an interest, both equitable and legal, in their PII that was conveyed to, collected by, and maintained by Defendant and that was accessed or compromised in the Data Breach.

126.    As a recipient of customers' PII, Defendant has a fiduciary relationship to its customers, including Plaintiff and the Class Members.

127.    Because of that fiduciary relationship, Defendant was provided with and stored private and valuable PII related to Plaintiff and the Classes. Plaintiff and Class Members were entitled to expect their information would remain confidential while in Defendant's possession.

128.    Defendant owed a fiduciary duty under common law to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

129.    As a result of the parties' fiduciary relationship, Defendant had an obligation to maintain the confidentiality of the information within Plaintiff's and Class Members' financial records.

130.    As a result of the parties' relationship, Defendant had possession and knowledge of confidential PII of Plaintiff and Class Members, information not generally known.

131.    Plaintiff and Class Members did not consent to, nor authorize Defendant to release or disclose their PII to unknown criminal actors.

31

132.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by, among other things:

a.  Mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII;

b.  Mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

c.  Failing to design and implement information safeguards to control these risks;

d.  Failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e.  Failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

f.  Failing to detect the breach at the time it began or within a reasonable time thereafter;

g.  Failing to follow its own privacy policies and practices published to its customers;

h.  Storing PII in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and

i.  Making an unauthorized and unjustified disclosure and release of Plaintiff's and the Class Members' PII to a criminal party.

133.    But for Defendant's wrongful breach of its fiduciary duties owed to Plaintiff and Class Members, their PII would not have been compromised.

134.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered injuries, including but not limited to:

a.  Loss of their privacy and confidentiality in their PII;

b.  Theft of the private information;

c.  Costs associated with the detection and prevention of identity theft and unauthorized use of their private information;

d.  Costs associated with purchasing credit monitoring and identity theft protection services;

e.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

g.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their private information being placed in the hands of criminals;

h.  Damages to and diminution in value of their private information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would

safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

i.   Continued risk of exposure to hackers and thieves of the PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

j.   Mental anguish accompanying the loss of confidences and disclosure of their confidential and private PII.

135.   As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF CONFIDENCE
**(On Behalf of Plaintiff and the Class)**

136.   Plaintiff and Members of the Class incorporate the above allegations as if fully set forth herein.

137.   Plaintiff brings this claim individually and on behalf of the Class.

138.   Plaintiff and Class Members have an interest, both equitable and legal, in their PII that was conveyed to, collected by, and maintained by Defendant and that was accessed or compromised in the Data Breach.

139.   Defendant was provided with and stored private and valuable PII related to Plaintiff and the Class, which it was required to maintain in confidence.

140.    Plaintiff and the Class provided Defendant with their personal and confidential PII under both the express and/or implied agreement of Defendant to limit the use and disclosure of such PII.

141.    Defendant owed a duty to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

142.    Defendant has an obligation to maintain the confidentiality of Plaintiff's and Class Members' PII.

143.    Plaintiff and Class Members have a privacy interest in their personal financial matters, and Defendant had a duty not to disclose confidential information and records concerning its customers.

144.    As a result of the parties' relationship, Defendant had possession and knowledge of confidential PII and confidential financial records of Plaintiff and Class Members.

145.    Plaintiff's and Class Members' PII is not generally known to the public and is confidential by nature.

146.    Plaintiff and Class Members did not consent to nor authorize Defendant to release or disclose their PII to unknown criminal actors.

147.    Defendant breached the duties of confidence it owed to Plaintiff and Class Members when Plaintiff and Class Members' PII was disclosed to unknown criminal hackers.

148.    Defendant breached its duties of confidence by failing to safeguard Plaintiff's and Class Members' PII, including by, among other things:

a.  Mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII;

b.  Mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

c.  Failing to design and implement information safeguards to control these risks;

d.  Failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e.  Failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

f.  Failing to detect the breach at the time it began or within a reasonable time thereafter;

g.  Failing to follow its own privacy policies and practices published to its customers;

h.  Storing PII in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and

i.  Making an unauthorized and unjustified disclosure and release of Plaintiff's and the Class Members' PII to a criminal party.

149.    But for Defendant's wrongful breach of its duty of confidences owed to Plaintiff and Class Members, their privacy, confidences, and PII would not have been compromised.

150.    As a direct and proximate result of Defendant's breach of Plaintiff's and Class Members' confidences, Plaintiff and Class Members have suffered injuries, including:

a.  Loss of their privacy and confidentiality in their PII;

b.  Theft of the private information;

c.  Costs associated with the detection and prevention of identity theft and unauthorized use of their private information;

d.  Costs associated with purchasing credit monitoring and identity theft protection services;

e.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

g.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their private information being placed in the hands of criminals;

h.  Damages to and diminution in value of their private information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

i.  Continued risk of exposure to hackers and thieves of the PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails

to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

j.   Mental anguish accompanying the loss of confidences and disclosure of their confidential and private PII.

151.   Additionally, Defendant received payments from Plaintiff and Class Members for services with the understanding that Defendant would uphold its responsibilities to maintain the confidences of Plaintiff's and Class Members' PII.

152.   Defendant breached the confidence of Plaintiff and Class Members when it made an unauthorized release and disclosure of their confidential information and PII, and, accordingly, it would be inequitable for Defendant to retain the benefit at Plaintiff's and Class Members' expense.

153.   As a direct and proximate result of Defendant's breach of its duty of confidences, Plaintiff and Class Members and entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**INTRUSION UPON SECLUSION / INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class)**

154.   Plaintiff and Members of the Class incorporate the above allegations as if fully set forth herein.

155.   Defendant publicized private details and facts not generally known to the public, not publicly available, and not of legitimate public concern about Plaintiff and the Class Members by disclosing and exposing Plaintiff's and the Class Members' Personal Information to enough

people that it is reasonably likely those facts have and/or will become known to the public at large, including, without limitation, on the dark web and elsewhere.

156.    The disclosure of patients' full names, Social Security numbers, and Personal Information is particularly harmful and would be offensive to a reasonable person of ordinary sensibilities.

157.    Defendant has a special relationship with Plaintiff and the Class Members and Defendant's disclosure of Personal Information is certain to embarrass them, offend their dignity, and put them at risk for significant financial fraud. Defendant should appreciate that the cyber-criminals who stole the Personal Information would fraudulently misuse that Personal Information, and further sell and disclose the data, just as they are doing. That the original disclosure is devastating to the Plaintiff and the Class Members, even though it originally may have only been disclosed to one person or a limited number of cyber-criminals, does not render it any less a disclosure to the public-at-large considering that said non-public information is now made public, and cannot be secured again.

158.    As a proximate result of such intentional misuse and disclosure, Plaintiff's and Class Members' reasonable expectations of privacy in their PII was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiff's and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant'

159.    Plaintiff's and the Class Members' Personal Information was publicly disclosed by Defendant in the Data Breach with reckless disregard for the reasonable offensiveness of the disclosure. Such disclosure is highly offensive and would be to any person of ordinary sensibilities.

Defendant knew or should have known that Plaintiff's and the Class Members' Personal Information is not a matter of legitimate public concern.

160. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been injured and are entitled to damages, as set forth herein.

## FIFTH CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
#### (On Behalf of Plaintiff and the Class)

161. Plaintiff and the Class realleges and incorporates by reference herein all the preceding allegations above as if fully alleged herein. This claim is pled in the alternative to the breach of express contract claim and all the other claims herein.

162. Plaintiff brings this claim individually and on behalf of the Class.

163. When Plaintiff and Class Members provided their PII to Defendant, they entered into implied contracts with Defendant, under which Defendant agreed to take reasonable steps to protect Plaintiff's and Class Members' PII, comply with its statutory and common law duties to protect Plaintiff's and Class Members' PII, and to timely notify them in the event of a data breach.

164. Defendant solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's provision of financial services. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

165. When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with its statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and to timely notify them in the event of a data breach.

166.    Plaintiff and Class Members paid money to Defendant to receive financial services. Plaintiff and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

167.    Plaintiff and Class Members would not have provided their PII to Defendant had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of a data breach.

168.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

169.    Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

170.    The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

   a.  Theft of the private information;

   b.  Costs associated with the detection and prevention of identity theft and unauthorized use of their private information;

   c.  Costs associated with purchasing credit monitoring and identity theft protection services;

   d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

   e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future

consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.   The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their private information being placed in the hands of criminals;

g.   Damages to and diminution in value of their private information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.   Continued risk of exposure to hackers and thieves of the PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.   Mental anguish accompanying the loss of confidences and disclosure of their confidential and private PII.

171.   As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### BREACH OF EXPRESS CONTRACT
### (On Behalf of Plaintiff and the Class)

172.    Plaintiff and the Class reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein. This claim is pleaded in the alternative to the breach of implied contract claim and all the other claims herein.

173.    Plaintiff brings this claim individually and on behalf of the Class.

174.    Defendant's privacy policy created an express contractual obligation to safeguard and protect the sensitive information of Plaintiff and Class Members.

175.    Defendant breached this contractual duty by failing to adequately safeguard Plaintiff's and Class Members' PII, and by allowing it to be disseminated to unauthorized third parties.

176.    Plaintiff and Class Members substantially performed their part of the bargain.

177.    Defendant's breach of this contractual obligation in the privacy policy and elsewhere caused damages to Plaintiff and Class Members, as set forth herein.

## SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

178.    Plaintiff hereby repeats and realleges the foregoing allegations.

179.    Plaintiff brings this claim in the alternative—pursuant to Rule 8 of the Federal Rules of Civil Procedure—to their breach of third-party beneficiary contract claim above.

180.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendants with their PII, which Defendant has made significant profit from. In exchange, Defendant should have provided adequate data security for Plaintiff and Class Members, which was required by statutory, common, and regulatory law.

181.    Defendant knew that Plaintiff and Class Members conferred a benefit on it in the form their PII as a necessary part of their obtaining services at Defendant's bank. Defendants appreciated and accepted that benefit. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

182.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Plaintiff and Class Members.

183.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

184.    Defendant, however, failed to secure Plaintiff's and Class Members' PII and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

185.    Defendant would not be able to carry out an essential function of its regular business without the PII of Plaintiff and Class Members and derived revenue by using it for business purposes. Plaintiff and Class Members expected that Defendant or anyone in Defendants' position would use a portion of that revenue to fund adequate data security practices.

186.    Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

187.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII, they would not have allowed their PII to be provided to Defendant.

188.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

189.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

190.    Plaintiff and Class Members have no adequate remedy at law.

191.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

192.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

193.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiff, on behalf of himself and the putative class, request judgment against Defendant and that the Court grants the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and their counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

　　　i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

46

ii.     requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendant to delete, destroy, and purge the PII of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.     prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendants' systems;

ix.    requiring Defendant to conduct regular database scanning and securing checks;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the PII of Plaintiff and Class Members;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.   For an award of punitive damages, as allowable by law;

F.   For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

49

G.      Pre- and post-judgment interest on any amounts awarded; and

H.      Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: August 7, 2024                              Respectfully Submitted,

Christopher D. Jennings
**JENNINGS PLLC**
500 President Clinton Avenue, Suite 110
Little Rock, AR 72201
Tel: (501) 255-8569
chris@jenningspllc.com

**KALIELGOLD PLLC**
Sophia Gold
490 43rd Street, No. 122
Oakland, California 94609
Tel: (202) 350-4783
sgold@kalielgold.com


*Attorneys for Plaintiff and the Putative Class*

*To file for pro hac vice*